

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UHS OF DELAWARE, INC., | Misc. Civil Action No. |
| Plaintiff, | 19-mc-168 |
| v. | **ORAL ARGUMENT REQUESTED** |
| UNITED STATES DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION | |
| Defendant. | |

## MOTION TO QUASH RESPONDENT'S ADMINISTRATIVE SUBPOENA

Petitioner UHS of Delaware, Inc. ("UHS-DE" or "Petitioner"), through its attorneys hereby moves to quash the subpoena duces tecum served by Respondent, United States Department of Labor, Occupational Safety and Health Administration ("OSHA") on Petitioner.

**WHEREFORE**, Petitioner respectfully requests that this Honorable Court grant the instant Motion to Quash.

Respectfully submitted,

/s/
Christen L. Casale (PA ID No. 320638)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Phone: 215.963.5000
Fax: 215.963.5001
christen.casale@morganlewis.com

Jonathan L. Snare
*pro hac vice application forthcoming
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-739-3000

DB1/ 107835257.1

202-739-3001 (fax)
jonathan.snare@morganlewis.com

*Attorneys for UHS OF DELAWARE, INC.*

Dated: October 8, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2019, a true and correct copy of the foregoing Petitioner's Motion to Quash Respondent's Administrative Subpoena was served in-person by process server on:

James Mulligan
Area Director
Braintree Area Office
Occupational Safety & Health Administration
United States Department of Labor
639 Granite Street
4th Floor
Braintree, MA  02184

In addition, courtesy copes were served via e-mail on:

Office of the Solicitor
United States Department of Labor
Robin Ackerman
Rachel Culley
Ackerman.Robin@dol.gov
Culley.Rachel.A@dol.gov

Carla J. Gunnin
Attorney at Law
Jackson Lewis P.C
Carla.Gunnin@jacksonlewis.com
*Counsel for UHS of Fuller, Inc.*

Christen L. Casale



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UHS OF DELAWARE, INC.,

        Petitioner,

    v.

UNITED STATES DEPARTMENT OF
LABOR, OCCUPATIONAL SAFETY AND
HEALTH ADMINISTRATION

        Respondent.

Misc. Civil Action No.

19 mc 168

**ORAL ARGUMENT REQUESTED**

### MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S
### MOTION TO QUASH RESPONDENT'S ADMINISTRATIVE SUBPOENA

Petitioner UHS of Delaware, Inc. ("UHS-DE" or "Petitioner"), through its attorneys,

hereby submits this Memorandum of Law in Support of its Motion to Quash the subpoena duces

tecum served by Respondent, United States Department of Labor, Occupational Safety and

Health Administration ("OSHA") on Petitioner in connection with its investigation of UHS of

Fuller, Inc. ("Fuller Hospital").

**I.   JURISDICTION AND VENUE**

The District Court has jurisdiction over this Motion to Quash pursuant to 29 U.S.C. §

657(b) and 28 U.S.C. § 1331.  UHS-DE is headquartered in King of Prussia, Pennsylvania,

where most of its corporate documents are maintained.  Venue is therefore proper in this Court

pursuant to 28 U.S.C. § 1391(c).

**II.   BACKGROUND AND RELEVANT FACTS**

Although UHS-DE and Fuller Hospital are separate and distinct entities, OSHA has

served the same overbroad subpoena on both organizations.  By way of background, UHS-DE is

a direct subsidiary of Universal Health Services, Inc. ("UHS").  *See* Carson Aff. ¶ 10, attached

hereto as Exhibit A. UHS-DE provides administrative support services to hospitals and facilities across the nation that are direct or indirect subsidiaries of UHS. *Id.* For the purposes of this case, UHS-DE provides support services to Fuller Hospital through a direct contract, and Fuller Hospital is an indirect subsidiary of UHS-DE and UHS. *Id.* ¶¶ 3-4, 10. UHS-DE is <u>not</u> involved in clinical care at the facilities and does <u>not</u> control clinical decisions. *Id.* ¶ 10. Likewise, UHS-DE does <u>not</u> set staffing schedules. *Id.* UHS-DE is <u>not</u> a licensed healthcare provider and does <u>not</u> provide healthcare services to patients—UHS-DE does <u>not</u> provide direct care to patients at Fuller Hospital (or any hospital or facility for that matter). *Id.* ¶ 11.

Fuller Hospital is a 102-bed private psychiatric facility located in South Attleboro, Massachusetts that provides both inpatient and outpatient care. *Id.* ¶ 3. Fuller Hospital (and not UHS-DE) provides services such as adult psychiatric, adolescent, and older adult inpatient programs, as well as partial hospitalization programs ("PHP") for adolescents and adults. *Id.* Patients with dual diagnosis psychiatric and substance abuse disorders can be treated on most units. *Id.*

Through a contract, UHS-DE offers administrative services to Fuller Hospital. *See* Exhibit B, UHS-DE Fuller Hospital Contract; Carson Aff. ¶ 11. Under this contract, Fuller Hospital is responsible for the day-to-day operations of the hospital, including workplace policies and employee safety. *See* Exhibit B; Carson Aff. ¶ 11. UHS-DE is responsible for providing administrative services, such as administering the payroll, ordering and purchasing inventory and supplies, and property maintenance. *See* Exhibit B. The relationship between UHS-DE and Fuller Hospital is that of independent contracting parties; Fuller Hospital's employees are not the employees of UHS-DE and vice versa. *Id.* § 2(C). In practice and under the express terms of the agreement, UHS-DE "does not control day-to-day employment policies,

practices, or decisions relating to employees employed by [Fuller Hospital]." *Id.* § 10(a).

On June 12, 2019, Natalie Kadis, an OSHA Compliance Safety and Health Officer ("CSHO"), initiated an onsite inspection of Fuller Hospital, located at 200 May Street Attleboro, Massachusetts 02703. The investigation was triggered by a complaint to OSHA regarding alleged staffing levels and risk of injury to employees from patients. *See* Exhibit C, Underlying Complaint to OSHA Regarding Fuller Hospital. The underlying complaint is limited to staffing issues and alleged patient violence at Fuller Hospital. OSHA did not and has not opened an inspection against UHS-DE.

UHS-DE, located at 367 S Gulph Road, King of Prussia, Pennsylvania 19406, is not the subject of OSHA's investigation. *See* Carson Aff. ¶ 1. Nonetheless, on June 12, 2019, it received a document preservation request from OSHA. On September 24, 2019, Fuller Hospital and UHS-DE received a subpoena duces tecum, attached hereto as Exhibit D. Although OSHA has not opened an investigation against UHS-DE, the subpoena is addressed to both UHS-DE and Fuller Hospital. *See* Exhibit D.

The subpoena contains 39 separate requests, the vast majority of which relate only to documents covering Fuller employees. Accordingly, UHS-DE does not maintain these requested documents. For example, Requests 1-18, 22, 24-26, 28-31, and 39 seek information regarding patients, staff, patient interactions with staff, and staffing decisions. As explained above, UHS-DE is not a licensed healthcare provider and does not provide healthcare services to patients. Thus, most subpoena requests served on UHS-DE have nothing to do with UHS-DE. And, the requests that specifically address UHS-DE are not relevant to OSHA's investigation of the underlying complaint of an incident at Fuller Hospital (Exhibit C). In other words, these overbroad requests are not reasonably tailored to the underlying complaint (Exhibit C) regarding

alleged patient assaults of Fuller Hospital employees at Fuller Hospital. For example:

- Request 4: Documents concerning UHS-DE's committees, workgroups, meetings, statements, policies, programs, protocols, and/or involving patient aggression and/or workplace violence.

- Request 19: Documents concerning UHS-DE's committees, workgroups, meetings, statements, policies, programs, and/or protocols for staffing levels at behavioral health hospitals, including but not limited to employee per occupied bed ("EPOB") targets and reports.

- Request 20: From January, 2017 to present, documents concerning employee suggestions and/or complaints about exposure to workplace violence and/or patient aggression, including complaints submitted through the UHS Compliance Hotline or in Patient Safety Culture Surveys and other surveys of employees at the Facility, along with any of your responses to employee suggestions and/or complaints.

- Request 21: Documents containing summaries of monthly visits and analyses from Universal Health Services, UHS of Delaware, and/or loss control representatives concerning workplace violence and/or patient aggression.

- Request 32: Documents sufficient to show the job description and major responsibilities of the following individuals: . . . (j) UHS-DE Regional Finance Director; (k) UHS-DE Vice President Gary Gilberti; (l) UHS-DE Loss Control Manager Gina Gilmore; (m) UHS-DE Loss Control Director Valerie Cupo; (m) UHS-De Director of Insurance; and (n) UHS-De Senior Vice President Karen Johnson.

- Request 33: Any and all documents, including but not limited to instruction manuals and handbooks, concerning UHS-DE training programs for chief operating officers, chief financial officers and chief executive officers.

- Request 34: Any and all documents, including but not limited to PowerPoint presentations and training materials, concerning UHS-DE orientation events for risk managers, directors of nursing, human resource directors, chief medical officers, and loss control managers.

- Request 35: Any and all documents concerning meetings of the CEOs of inpatient facilities in Massachusetts that were owned and/or managed by UHS of Delaware, Inc., including but not limited to meetings convened by Gary Gilberti.

- Request 36: Any and all documents concerning the UHS-DE Ten Elements of Risk Management (T.E.R.M.) program

- Request 37: Any and all documents concerning awards granted by UHS or UHS-

DE, including but not limited to the Service Excellence Award and the Chairman's Council Award.

- Request 38: Any and all documents concerning UHS-DE Risk Management and Clinical Services patient safety advisories, including but not limited to Senior Leadership Oversight of Patient Checks.

In addition, most requests – for example, Request 33, which demands "all documents . . . concerning UHS-DE training programs for chief operating officers, chief financial officers and chief executive officers" – seek commercially sensitive and trade secret information from UHS-DE that serves no relevant purpose.[1]  Finally, the requests as written will likely require the productions of (tens or hundreds of) thousands of pages.  Despite the overbroad nature of these requests, OSHA issued the subpoena on September 24, 2019 and gave UHS-DE and Fuller Hospital only until October 8, 2019 to comply.  *See* Exhibit D.

## III.   ARGUMENT

### A.  LEGAL STANDARD

The validity of administrative subpoenas is subject to judicial review by the District Court.  *See, e.g. Equal Emp't Opportunity Comm'n (E.E.O.C.) v. Am. & Efird Mills, Inc.*, 964 F.2d 300, 302 (4th Cir. 1992).  A District Court shall order compliance with an administrative subpoena if: (1) Congress has granted authority to investigate; (2) procedural requirements have been followed; and (3) the evidence is relevant and material to the investigation.  *See, e.g. Dole v. Trinity Indust., Inc.*, 904 F.2d 867, 871 (3d Cir. 1990).  *See also McLaughlin v. Trinity Indus., Inc.*, 1988 WL 391531, *1 (July 27, 1998 M.D. Fla.) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)).  "If the government makes this preliminary showing, the burden

---

[1] As detailed herein, UHS-DE believes that these requests go beyond the scope of OSHA's permitted investigation and are unduly burdensome, among other issues.  To the extent that the Court nonetheless orders UHS-DE to produce documents, UHS-DE would first respectfully request a confidentiality order to protect its proprietary information and trade secrets.

shifts to the respondent to prove that enforcement of the subpoena would be improper." *Chao v. Community Trust Co.*, 474 F.3d 75, 79 (3d Cir. 2007). Enforcement is improper where the request is overly broad or unduly burdensome, *see, e.g. Chao v. Conocophillips Co.*, 2003 WL 22794705, at *2 (E.D. Pa. Nov. 5, 2003), or otherwise improper. *See, e.g. Chao v. Koresko*, 2005 WL 2521886 (3d Cir. Oct. 12, 2005). "The ultimate inquiry is whether enforcement of the administrative subpoena would constitute an abuse of the court's process." *Nat'l Labor Relations Board v. Jo-Dan Madalisse Ltd., LLC*, 2015 WL 9302922 (E.D. Pa. Dec. 22, 2015) (quoting *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 125 (3d Cir. 1981)).

## B. THE INFORMATION SOUGHT IS NOT REASONABLY RELEVANT TO THE INVESTIGATION

When assessing an administrative subpoena, "[r]elevancy is determined in terms of the investigation." *E.E.O.C. v. Federal Exp. Corp.*, 558 F.3d 842, 854 (9th Cir. 2009); *see also E.E.O.C. v. McLane Co., Inc.*, 2012 WL 1132758, at * 5 (D. Ariz. Apr. 4, 2012) ("[T]he Court will consider the definition of its investigation that the E.E.O.C. provided."). The question to ask is whether the information sought is "relevant and material to the investigation." *E.E.O.C. v. Aaron Bros. Inc.*, 620 F. Supp. 2d 1102, 1107 (C.D. Cal. 2009). For a subpoena to be enforceable, it is necessary that "the material sought touches on a matter under investigation." *U.S. ex rel. Office of Inspector Gen. v. Philadelphia Hous. Auth.*, 2011 WL 382765, at *3 (E.D. Pa. Feb. 4, 2011) (citations omitted). The subpoena, as it relates to UHS-DE, fails to meet even this low bar.

OSHA's authority to conduct investigations is limited in nature. To investigate, OSHA must have probable cause based on "specific evidence of an existing violation" or authority through an administrative initiative (i.e., a programmed inspection, which is not applicable here). *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978). For unprogrammed inspections

like this one, an "individualized inquiry" is required to determine the scope of the investigation because of the "increased danger of abuse of discretion and intrusiveness' due to the 'lack [of] administrative and legislative guidelines that ensure that the target of the search was not chosen for the purpose of harassment.'" *United States v. Mar-Jac Poultry, Inc.*, 756 F. App'x 856, 861 (11th Cir. 2018) (*quoting Donovan v. Sarasota Concrete Co.*, 693 F.2d 1061, 1068 (11th Cir. 1982)). In *Mar-Jac Poultry*, the United States Court of Appeals for the Eleventh Circuit explained why OSHA lacked authority to conduct a comprehensive (so-called "wall-to-wall") search within a *single* facility:

> The scope of such an unprogrammed inspection must bear an appropriate relationship to the violation alleged by the evidence. *Donovan*, 693 F.2d at 1068–69. "[W]hen nothing more is offered than a specific complaint relating to a localized condition, probable cause exists for a search to determine only whether the complaint is valid." *Id.* A full scope [wall-to-wall] inspection of a facility may nonetheless be authorized in some circumstances. For example, *Donovan* stated "it is conceivable that a specific violation plus a past pattern of violations may be probable cause for a full scope inspection. In addition, a specific complaint may allege a violation which permeates the workplace so that a full scope inspection is reasonably related to the complaint." *Id.* at 1068–69.

*Id.* In short, OSHA's investigation must be reasonably tailored to the hazards alleged in the underlying complaint that triggered the investigation. As *Mar-Jac Poultry* makes clear, OSHA does not automatically have the right to inspect every inch of a single facility—much less other locations and other employers. OSHA's inspection rights depend on the nature of the complaint. And here, the complaint has to do with a single alleged incident at a single facility.

In the present case, OSHA advised Fuller Hospital that its investigation was based on a complaint[2] about staffing levels and risks posed by potentially violent patients <u>at Fuller Hospital</u>.

---

[2] In its entirety, the underlying complaint alleges: "1) At times there is no nursing director and/or qualified nursing supervisor on the units. 2) Staff are exposed to increased risk of assault and injury from inadequate staffing levels. There have been multiple serious staff injuries, including head and neck injuries from patient assaults." Exhibit C. These limited allegations are not wide sweeping, but instead focus on staffing at a single facility.

It subsequently stated that it was investigating an alleged incident of workplace violence <u>at Fuller Hospital</u>. Thus, the investigation's scope is limited to Fuller Hospital. OSHA has not opened an investigation against UHS-DE—and yet OSHA sent one single subpoena to both UHS-DE and Fuller Hospital. As explained above, UHS-DE is not involved in clinical care at the facilities and does not control clinical decisions. UHS-DE does not set staffing schedules. UHS-DE is not involved in clinical care at the facilities and does not control clinical decisions. UHS-DE is not a licensed healthcare provider and does not provide healthcare services to patients. UHS-DE does not directly provide care to patients at Fuller Hospital (or any hospital or facility for that matter). Notwithstanding the foregoing, OSHA has subpoenaed documents related both to UHS-DE's own employment policies and practices and information regarding other facilities with which UHS-DE contracts. *See, e.g.*, Ex. C at Requests 4, 18, 20-21, and 34-38. OSHA has provided no plausible nexus between these documents and the events forming the basis of the investigation.

It strains credulity that most of the information requested from UHS-DE is relevant, when, as the UHS-DE Fuller Hospital Contract outlines, Fuller Hospital is responsible for its own workplace violence program; Fuller Hospital controls employment conditions at its own facilities; the underlying complaint to OSHA regarding alleged patient violence involved Fuller Hospital employees; and UHS-DE employees do not provide healthcare services at Fuller Hospital.[3] Documents related to UHS-DE employment policies, trainings, and corporate awards (*see, e.g.*, Ex. C at Subpoena Requests 4, 32-34, 36-38) – along with information regarding facilities with which UHS-DE contracts (*see, e.g.*, Ex. C at Subpoena Requests 4, 6-8, 20-21, and 33-36) – have no bearing on OSHA's investigation and are certainly not "relevant and material" to the investigation of a patient/employee incident at Fuller Hospital.

---

[3] To the extent that UHS-DE has documents relevant to workplace violence incidents and staffing at Fuller, the facility itself also has these documents.

This case is easily distinguished from *Dole v. Trinity Indust., Inc.*, 904 F.2d 867, 872-73 (3d Cir. 1990). In that case, OSHA investigated a worksite based on an employee complaint and then subpoenaed safety and health records that <u>the employer was required by law to maintain</u> related to that <u>same facility</u>. *Id.* The Third Circuit explained that requiring the production of records that an employer already is required to keep did not inappropriately expand the scope of OSHA's inspection. *See id.* ("Requiring that an employer produce for the Secretary's inspection records that by law he must keep for her use is hardly equivalent to undertaking a comprehensive [wall to wall] plant inspection."). Reading *Dole* to permit OSHA to subpoena entirely separate businesses and workplaces in entirely different locations – or to collect documents that do not "touch[] on a matter under investigation" – would render the "reasonable relevancy requirement" meaningless. *Philadelphia Hous. Auth*, 2011 WL 382765, at *3. OSHA's subpoena to UHS-DE goes far beyond the reasonable scope of its investigatory authority.

## C. THE REQUESTS ARE OVERBROAD AND UNDULY BURDENSOME

Despite its expansive reach, "[a]n administrative subpoena [] may not be so broad so as to be in the nature of a fishing expedition." *Peters v. United States*, 853 F.2d 692, 700 (9th Cir. 1988). Put another way, "[t]he demand for information must not be overbroad or burdensome." *E.E.O.C. v. Bessemer Grp., Inc.*, 105 Fed. App'x 411, 413 (3d Cir. 2004). As the Supreme Court observed in *Morton Salt*, "a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Id.*, 338 U.S. at 652. OSHA must demonstrate that the subpoena "is no broader than necessary to achieve its purpose." *Peters*, 853 F.3d at 700.

Here, the subpoena is astonishingly broad. It seeks a data dump of documents, mostly pertaining to other facilities and UHS-DE's internal trainings and policies. It is difficult to

understand how these requested documents could possibly assist OSHA in determining the adequacy of Fuller Hospital's policies or in analyzing the workplace violence incident purportedly at issue. Instead, OSHA seeks thousands (or perhaps more given the breadth of these requests) of irrelevant pages of confidential and proprietary documents. *See, e.g.,* Exhibit C at Subpoena Requests 4, 19-21, 32-38.

In addition, OSHA seeks production in just a two-week time period, a request so unmanageable that it risks posing a burden so great that it would "threaten, unduly disrupt, or seriously hinder" UHS-DE's normal business operations. *Jo-Dan Madalisse*, 2015 WL 9302922 at *3. UHS-DE provides administrative services to around 200 behavioral health hospitals and facilities across the country. Several of OSHA's requests appear to seek information regarding any facility with which UHS-DE works anywhere in the United States. *See, e.g.,* Exhibit C at Subpoena Requests 4, 19, 20, 21, 33, 34, 36, 38. Responding to these overbroad requests would require a huge effort (in terms of time, manpower, money and other resources) by both UHS-DE and the facilities with which UHS-DE contracts, none of which are subjects of the current investigation. For example, Request 20 asks for "documents concerning employee suggestions and/or complaints about exposure to workplace violence and/or patient aggression" from 2017 to present. Approximately 87,000 employees work at UHS subsidiary facilities. Searching for documents that may be responsive to this request at all facilities nationwide would be a colossal task. Instead of focusing on the incident at Fuller Hospital and the documents related to that facility, which are in the possession of Fuller Hospital, OSHA's requests expand to entirely unrelated workplaces. Workplaces that have nothing to do with the incident in the complaint that OSHA is investigating. *See* Exhibit C. Workplaces that the employees at Fuller Hospital may not even know exist. It is just the type of "fishing expedition" that exceeds OSHA's

investigatory authority.

Indeed, OSHA's overly broad and burdensome requests exceed its own jurisdictional authority. On their face, many nationwide requests would cover facilities with UHS-DE contracts located in, for example, California, Nevada, Washington, and North Carolina. *See, e.g.*, Exhibit C at Subpoena Requests 4, 19, 20, 21, 33, 34, 36, 38. However, OSHA lacks jurisdiction to investigate workplace hazards in these states. *See* Section 18 of the Occupational Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C. § 667; *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 99 (1992) ("The design of the [OSH Act] persuades us that Congress intended to subject employers and employees to only one set of regulations, be it federal or state, and that the only way a State may regulate an OSHA-regulated occupational safety and health issue is pursuant to an approved state plan that displaces the federal standards."); *Secretary of Labor v. Christie Constructors, Inc.*, 18 O.S.H. Cas. (BNA) ¶ 1559 (O.S.H.R.C.A.L.J. Oct. 26, 1998) (Washington State Department of Labor and Industries had exclusive jurisdiction to investigate occupational safety and health hazards in its state; federal OSHA jurisdiction was limited to vessels located on navigable waters of the United States in Washington); *Secretary of Labor v. Southwest Marine, Inc.*, 18 O.S.H. Case (BNA) 1512 (O.S.H.R.C.A.L.J. July 16, 1998) ("It is undisputed that California has an operational state plan which has been deemed to provide employee protection equivalent to that provided by federal standards in the issues covered . . . OSHA's attempt to invoke concurrent jurisdiction is contrary to Congressional intent expressed in *Gade*, and is improper."). Thus—not only does this subpoena run afoul of case law prohibiting irrelevant, overbroad and burdensome requests—the subpoena also exceeds OSHA's jurisdictional authority to investigate.

### D.  THE SUBPOENA IS WELL BEYOND THE "LEGITIMATE PURPOSE" OF THE OSHA INSPECTION

It appears that OSHA is using its investigation of Fuller Hospital to obtain documents relating to some 200 healthcare facilities not subject to investigation, raising doubts as to whether the subpoena is for a "legitimate purpose" or whether it is an abuse of the court's process. *FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995). In the past nine years, federal OSHA has investigated—through a combination of formal and informal complaints—approximately 39 facilities nationwide with UHS contracts to confirm the adequacy of workplace violence policies. ***Those investigations have resulted in no affirmed citations against UHS-DE related to workplace violence.***[4] It bears repeating here that, before an inspection even begins, employers have a right under the Fourth Amendment to the U.S. Constitution to be free from unreasonable searches and seizures, which includes workplace inspections by OSHA, *See, e.g. Martin v. Int'l Matex Tank Terminals-Bayonne*, 928 F.2d 614, 620-21 (3d Cir. 1991) ("OSHA is limited in its authority to inspect under these statutory provisions by the Fourth Amendment."); *Mar-Jac Poultry, Inc.*, 756 F. App'x at 856 (courts must scrutinize the scope of unprogrammed OSHA inspections due to an increased risk of "abuse of discretion and intrusiveness"). Using the unrelated investigation of Fuller Hospital to obtain documents related to separate facilities throughout the United States – with no basis for so doing – circumvents this Constitutional right. It is inappropriate and an abuse of judicial processes.

### IV.  CONCLUSION

For all of the foregoing reasons, Petitioners respectfully request that the Court grant its Motion to Quash.

---

[4] Most investigations resulted in no citations issued; the handful of issued citations have been appealed or otherwise settled.

Petitioners respectfully request oral argument on this motion.

Dated: October 8, 2019

MORGAN, LEWIS & BOCKIUS LLP

By: _____
Christen L. Casale (PA ID No. 320638)
1701 Market Street
Philadelphia, PA  19103
Telephone:  +215.963-5000
Facsimile:  +215.963-5001
christen.casale@morganlewis.com

Jonathan L. Snare
*pro hac vice application forthcoming*
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Jonathan.snare@morganlewis.com
Telephone:  +1.202.739.3000
Facsimile:  +1.202.739.3001

*Attorneys for UHS OF DELAWARE, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October 2019, a true and correct copy of the

foregoing Petitioner's Memorandum in Support of Motion to Quash Respondent's

Administrative Subpoena was served in-person by process server on:

> James Mulligan
> Area Director
> Braintree Area Office
> Occupational Safety & Health Administration
> United States Department of Labor
> 639 Granite Street
> 4th Floor
> Braintree, MA  02184

In addition, courtesy copes were served via e-mail on:

> Office of the Solicitor
> United States Department of Labor
> Robin Ackerman
> Rachel Culley
> Ackerman.Robin@dol.gov
> Culley.Rachel.A@dol.gov

> Carla J. Gunnin
> Attorney at Law
> Jackson Lewis P.C
> Carla.Gunnin@jacksonlewis.com
> *Counsel for UHS of Fuller, Inc.*

Christen L. Casale

# EXHIBIT A

## AFFIDAVIT OF MICHELLE CARSON

COMMONWEALTH OF PENNSYLVANIA )
 ) SS:
COUNTY OF MONTGOMERY )

MICHELLE CARSON, being first duly sworn and upon her oath, deposes and says:

1. I am Associate General Counsel – Litigation for UHS of Delaware, Inc. ("UHS-DE"), the management company for Universal Health Services, Inc. ("UHS"), located at 367 South Gulph Road, King of Prussia, PA 19406.

2. The facts contained herein are true and correct to the best of my knowledge, information and belief.

3. UHS of Fuller, Inc, d/b/a Arbour-Fuller Hospital ("Fuller") is a private 102-bed psychiatric facility located in South Attleboro, Massachusetts that provides inpatient and outpatient care. Fuller provides services such as adult psychiatric, adolescent, and older inpatient programs, as well as partial hospitalization programs for adolescents and adults. Patients with dual diagnosis psychiatric and substance abuse disorders can be treated on most units.

4. Fuller is an indirect subsidiary of UHS.

5. UHS is and has been a holding company that operates through its subsidiary facilities. UHS performs no separate day-to-day operations.

6. UHS does not have any employees.

7. UHS is not registered to do business in the Commonwealth of Massachusetts.

8. UHS is not licensed as a healthcare provider, does not provide healthcare services, and does not provide operational management services to its subsidiary facilities, including Fuller.

DB1/ 107695835.5

9.      Each subsidiary facility, including Fuller, is licensed to provide healthcare services in its respective state.

10.     UHS-DE is a direct subsidiary of UHS.  UHS-DE provides administrative support services to over 200 behavioral health hospitals and facilities across the country that are direct or indirect subsidiaries of UHS, including Fuller.  More than 87,000 employees work at the UHS subsidiary facilities.  UHS-DE is not involved in clinical care at the facilities and does not control clinical decisions.  UHS-DE does not set staffing schedules.

11.     Although UHS-DE is registered to do business in the Commonwealth of Massachusetts, it is not a licensed healthcare provider and does not provide healthcare services to patients.  Through a contract with Fuller, UHS-DE offers administrative support services to Fuller.  Fuller is responsible for the day-to-day administration of employment policies, practices, and decisions relating to employees employed by Fuller.

12.     UHS-DE contracts with facilities in California, Nevada, Washington, and North Carolina.

13.     Upon information and belief, in the past nine years, federal OSHA has investigated, through a combination of formal and informal complaints, approximately 39 UHS-subsidiary facilities to confirm the adequacy of workplace violence policies.  Those investigations have resulted in no affirmed citations against UHS-DE related to workplace violence.

14.     Everything stated within this affidavit is true and correct to the best of affiant's

knowledge, information and belief.


DATED this 8th day of October, 2019.


                                        _UCarson_____
                                        Michelle K. Carson


Commonwealth of Pennsylvania      )
                                  )
County of Montgomery              )


I, _Douglas R. Tewksbury_ , a Notary Public in and for the aforesaid State and County, do
hereby certify that _Michelle K. Carson_____ ,
personally appeared before me and made the oath that the foregoing statements are true.

Given under my hand and notarial seal, this _8th_ day of _October_ , 2019.


Commission Expires: _10/25/20_          _Douglas R. Tks_____
                                        Notary Public


(Seal)
COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
DOUGLAS R. TEWKSBURY, Notary Public
Upper Merion Twp., Montgomery County
My Commission Expires October 25, 2020


3

# EXHIBIT B

### MANAGEMENT AGREEMENT

This Management Agreement ("Agreement") is made as of April 1st 2016, by and between UHS of Delaware, Inc., a Delaware corporation ("Manager") and UHS of Fuller, Inc. d/b/a Arbour-Fuller Hospital ("Facility").

### BACKGROUND:

A.    Facility owns and operates a behavioral health facility located in the Commonwealth of Massachusetts.

B.    Manager, among other things, is in the business of providing comprehensive administrative, management, information and other services to behavioral health care entities and facilities as more specifically described in this Agreement (collectively, the "Services").

C.    Facility hereby engages Manager to provide the Services and Manager agrees to provide such Services pursuant to the terms and conditions set forth in this Agreement.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and intending to be legally bound hereby, Facility and Manager agree as follows:

### AGREEMENT:

1.    **Incorporation of Background; Defined Terms**.  The "Background" provisions set forth above (including, but not limited to all defined terms set forth therein) are true and correct and are hereby incorporated by reference into this Agreement and made a part hereof as if set forth in their entirety.

2.    **Appointment and Relationship of the Parties**

A.    Appointment.  Facility hereby engages Manager and Manager hereby agrees to be engaged to serve as the manager of the Facility and provide the Services to Facility during the Term of this Agreement.

B.    Term.  This Agreement shall commence at 12:01 a.m. on January 1, 2016 (the "Effective Date") and end of December 31, 2016 ("Initial Term").  Thereafter, this Agreement shall automatically renew for successive one (1) year terms until terminated pursuant to Section 9, below (collectively, the "Renewal Terms") (the Initial Term and any Renewal Term thereafter shall be collectively referred to herein as the "Term").

C.    Independent Relationship.  The relationship between Manager and Facility is that of independent contracting parties and neither Manager nor Facility, nor their respective employees, servants, agents or representatives shall be considered the employee, servant, agent or representative of the other, except with respect to duties specifically delegated to Manager under this Agreement.  Each party shall be responsible solely for and shall comply with all Federal, state, county and municipal laws and regulations pertaining to employment taxes,

income withholding, unemployment compensation contributions and other employment related statutes applicable to that party.

D.    No Patient Referrals. The parties agree that the benefits to Facility hereunder do not require, are not payment for, and are not in any way contingent upon the admission, referral, or any other arrangement for the provision of any item or services offered by Manager to the patients of Facility. The parties to this Agreement agree that no payments made hereunder are made in return for, or to induce any person to:

(1)    Refer an individual to anyone for the furnishing or arranging for the furnishing of items or services for which payment may be made in whole or in part under Medicare or Medicaid; or

(2)    Purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under Medicare or Medicaid.

3.    **Duties and Responsibilities of Manager**

A.    General Duties and Responsibilities. Manager is authorized to provide management services to the Facility in accordance with the terms and conditions of this Agreement and to provide the Services in a manner consistent with the prudent and workmanlike management, operation, maintenance and supervision of facilities similar to Facility.

B.    Services. Without limiting the provisions of Section 3.A., above, Manager shall provide the following Services for the Facility:

(1)    Preparation of Budgets. Manager shall assist Facility in the preparation of annual capital and operating budgets reflecting in reasonable detail the anticipated revenues and expenses and sources and uses of capital for enhancement, remediation/repair or growth of Facility and its clinical operations. While Manager shall provide assistance in the preparation of an annual budget, Facility acknowledges that they are solely and independently responsible for the preparation of an annual budget.

(2)    Service Development. At least annually, Manager shall review, analyze and make recommendations related to the expansion of Facility's service lines and need for capital expenditures and improvements.

(3)    Inventory and Supplies. Manager shall cause to be ordered and purchased inventory and supplies, and such other ordinary or appropriate materials which are necessary for the operation of Facility (collectively, the "Supplies). The cost of such Supplies shall be borne by Facility and shall not be included in the Management Fee (as defined in Section 6).

(4)    Systems and Procedures. Manager shall develop and implement all systems and procedures required for the efficient operations of Facility. The systems and procedures shall include, without limitation:

    (a)     the billing system;
    (b)     the collection system;
    (c)     the disbursement system;
    (d)     the payroll system;
    (e)     the insurance claim system;
    (f)     the management information system; and
    (g)     the patient safety improvement system.

(5)    Records and Confidentiality.  Manager shall maintain or cause to be maintained a comprehensive system of records, books and accounts for Facility, which records, books and accounts shall, to the extent possible, be maintained on the premises of Facility. Manager shall, in connection with the performance of the Services, maintain the confidentiality of all financial information of Facility as well as protected health information of Facility's patients in accordance with the requirements of the Health Insurance Portability and Accountability Act of 1996, and its implementing regulations (collectively, "HIPAA").  Manager shall comply with the terms of the Business Associate Agreement with Facility as attached hereto on Exhibit A.

(6)    Compliance with Laws.  Manager shall assist Facility in connection with any and all actions as may be necessary to comply with all laws, rules, regulations, interpretive guidelines, accreditation standards, orders and requirements of any Federal, state, county or municipal authority  or accrediting body (collectively, "Applicable Laws") relating to Facility. Manager shall comply with all Applicable Laws in connection with its performance of the Services under this Agreement.

(7)    Marketing.  Manager, following consultation with Facility, shall design and implement an adequate and appropriate public relations program on behalf of Facility, with appropriate emphasis on public awareness of the availability of services from Facility.  The public relations program shall be conducted in compliance with all Applicable Laws governing the operation of Facility.

(8)    Managed Care.  Manager shall review and, upon Facility request, negotiate, all managed care contracts on behalf of Facility.

(9)    Property, Plant and Equipment.  Manager shall arrange for the proper maintenance and repair of Facility's property, plant and equipment.  The costs related to any maintenance and repairs shall be borne by Facility.

(10)    Personnel and Benefits.

    (a)    Manager shall provide human resources management services for the successful operation of Facility.  Such services may include but not be limited to: consulting on employment and labor issues; providing model policies and best practices; and negotiating contracts for benefits and other

services. Manager does not control day to day employment policies, practices or decisions relating to employees employed by Facility.

(b) Manger shall provide Facility with the following personnel necessary for the management of the Facility: (a) Chief Executive Officer; (b) Chief Financial Officer; (c) Chief Operating Officer and (d) Chief Nursing Officer (collectively, "Key Personnel"). Manager shall negotiate and contract with all Key Personnel for services to be provided at Facility. Salaries and benefits of Key Personnel shall be included in the Management Fee. Such Key Personnel shall provide specific duties on behalf of the Facility consistent with their respective job descriptions and shall have authority to execute contracts on behalf of Facility consistent with the parameters set forth in this Agreement.

(c) Manager shall contract for and supervise the preparation and filing of all necessary forms for disability insurance, hospitalization and group life insurance, unemployment insurance for Facility's employees (collectively "Benefits"), withholding and social security taxes and all other forms required by any Federal, state, municipal or other governmental authority or by any labor union agreement. The costs related to such Benefits shall be borne by Facility.

(11)    Insurance.

(a) Manager shall cause to be purchased all forms of insurance required by Applicable Laws or deemed necessary or advisable to adequately to protect Facility and its properties, whether owned or leased by it, including, but not limited to public liability insurance, fire and extended coverage insurance and burglary and theft insurance.

(b) Manager shall also cause to be purchased professional liability insurance on behalf of Facility in form and such amounts as required by Applicable Laws.

(c) All insurance coverage shall be placed with such companies, in such amounts, and with such beneficial interest appearing therein as shall be acceptable to Facility. Manager shall supervise the prompt investigation and filing of full timely written reports to the insurance companies as to all accidents and claims for damages relating to the ownership, operation and maintenance of Facility's properties and business and shall supervise the preparation of any and all reports required by any insurance company in connection therewith. All such reports shall be timely filed with the insurance company as required under the terms of insurance policy involved. Manager is authorized to settle any and all claims against insurance companies arising out of any policies, including

the execution of proofs of loss, the adjustment of losses, signing of receipts, and the collections of money.

(d)     The costs related to the maintenance of all insurance coverage set forth in this Section 3.B.11, including, but not limited to premiums and deductibles, shall be borne by Facility.

(12)     <u>Legal Actions</u>.  Manager shall assist and advise Facility regarding any and all legal actions or proceedings. If necessary, Manager shall engage and manage outside counsel on behalf of Facility.  The costs of all such legal actions or proceedings shall be borne by Facility.

(13)     <u>Contract Negotiation.</u>  In addition to assisting in the negotiation of managed care contracts for Facility, Manager shall, at the request of Facility, negotiate on behalf of and in the name of Facility such agreements as Manager deems necessary or advisable for the furnishing of goods and services necessary for the operation of Facility, including, without limitation, professional services agreements maintenance agreements, and real and personal property lease agreements (collectively, "Facility Agreements").   Compensation to third parties for Services provided under Facility Agreements shall be borne by Facility.

(14)     <u>Collections and Disbursements; Operating Accounts</u>.  Manager shall be responsible for the billing and collection for services provided by Facility.  All monies collected shall be deposited in such commercial bank or banks as Manager from time to time designates, in demand, deposit or savings accounts opened for and on behalf of Facility (such accounts hereinafter referred to as the "Operating Accounts"), and from the revenues so collected and deposited on behalf of Facility, Manager will supervise the regular and punctual payment of all Operating Expenses (as defined herein).  All interest accruing on the Operating Accounts shall serve to increase such accounts.  In the event of any shortfall in the amounts available from such revenues and Operating Accounts to pay the Operating Expenses, it shall be the obligation of Facility to pay such amounts from the Reserve Account (as defined herein) or otherwise. Nothing in this Agreement shall require Manager to advance Operating Expenses or any other funds on behalf of Facility.  "Operating Expenses" shall mean all expenses and costs incurred incident to the day to day conduct of Facility and all other amounts otherwise due and payable to any person or entity in connection with the operation and management of Facility or the discharge of any of Manager's duties under the terms of this Agreement.

(15)     <u>Taxes</u>.  All taxes and assessments properly levied with respect to the Facility shall be paid by Manager in the name and for the account of Facility from the Operating Accounts.

C.     <u>Events Excusing Performance</u>.  Manager shall not be liable to Facility for failure to perform any of the Services required herein in the event of strikes, lock-outs, calamities, acts of God, unavailability of supplies or other events over which Manager has no control for so long as such events continue, and for a reasonable period of time thereafter.

4.     **Cooperation of Facility.**   Facility shall provide Manager with all information necessary for Manager's performance of the Services hereunder.

5.     **Revenues and Reserve Account**

All revenues generated by or with respect to Facility shall accrue solely to Facility and shall be its property.  Manager shall establish a separate account (hereinafter the "Reserve Account") which shall be separate from the Operating Accounts and shall be a demand, deposit or savings account at such financial institution or institutions as Manager from time to time designates and into which Manager shall deposit such amounts from the revenues of Facility as it deems appropriate.  All interest accruing on the Reserve Account shall serve to increase the Reserve Account.  Funds may be disbursed out of the Reserve Account from time to time under the direction of Manager as may be required for purposes of operating Facility, including, without limitation, meeting Facility's working capital, capital improvement or contingency needs.

6.     **Financial Arrangements**

A.     Management Fee. Facility and Manager agree that the compensation set forth in this Section 6 is being paid to Manager in consideration of the Services rendered and substantial commitment made by Manager hereunder and that the Management Fee (as defined in subsection B, below) is fair, reasonable and consistent with fair market value.

B.     Annual Management Fee.

(1)     For each year of the Term of this Agreement, Facility shall pay to Manager, as compensation for services rendered hereunder, a monthly fee based upon a pro rata portion of the Manager's aggregate operating costs ("Management Fee").
(2)     Facility agrees that if the United States or the Commonwealth of Pennsylvania or any of their subdivisions having jurisdiction shall levy, assess, or charge any tax, assessment or imposition in the nature of a sales, use or service tax, charge or assessment upon the management fee, then the Facility shall pay (or reimburse Manager for) such tax, assessment or imposition.

C.     Reimbursement. In addition to the Management Fee described above, and in recognition of the fact that certain costs and expenses paid or incurred by Manager will be paid or incurred in the best interests of and on behalf of Facility, Facility hereby agrees to reimburse Manager for all of the costs and expenses paid or incurred by Manager on behalf of Facility. Without limiting the generality of the foregoing, Facility agrees to reimburse Manager for any travel, meals or lodging costs reasonably incurred by Manager in connection with the provision of the Services under this Agreement.

D.     Payments. Facility shall establish a depository account (the "Account") in Facility's name at a bank or lending institution of Facility's choice.  Such Account shall be the sole and exclusive property of Facility. Facility shall issue a revocable instruction to the

financial institution to sweep the amounts deposited into the Account on a daily basis to pay the Management Fee into an account established at such financial institution by Manager, which shall be the sole and exclusive property of Manager ("Concentration Account"). Facility hereby agrees that all such amounts deposited into the Account shall be transferred pursuant to such instruction to the Concentration Account in connection with Facility obligations pursuant to this Agreement. Manager acknowledges that Facility's instructions given to the applicable financial institution pursuant to this Section 6.D. shall be revocable at the sole and exclusive direction of Facility. Manager shall make disbursements of any and all moneys deposited in the Concentration Account strictly in accordance with the terms of this Agreement.

7.    **Records**

A.    During the Term of this Agreement, and for two (2) years thereafter, Facility or its designees shall have reasonable access during normal business hours to the financial records of Manager, including, but not limited to, records of collections, expenses and disbursements as kept by Manager in performing the Services under this Agreement, and Facility may copy any or all such records at its own expense.

B.    During the Term of this Agreement, and for seven (7) years thereafter, Manager and its designees shall have reasonable access during normal business hours, including the right to make and retain copies at its own expense, to the records (including medical records) maintained by Facility to defend any claim regarding services rendered pursuant to this Agreement.

8.    **Indemnification**

Facility shall indemnify Manager, Manager's Key Personnel and all agents, employees and representatives of Manager against any and all claims, damages, costs, fees and expenses (including settlements, judgments, court costs and attorneys' fees, regardless of the outcome of such claim or action) (collectively, "Damages") resulting from (i) the Services provided to Facility under this Agreement, except if such Damages are caused by the willful misconduct or gross negligence of Manager; (ii) the operation of Facility, including, but not limited to, services provided by Facility to patients; and (iii) Facility's obligations under Facility Agreements.

9.    **Termination of this Agreement**

A.    Termination by Facility and Manager.  This Agreement may be terminated at any time upon the mutual written consent of Facility and Manager.

B.    Termination by Facility.  Facility may terminate this Agreement as follows:

(1)    In the event of the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors by Manager, or upon other action taken or suffered, voluntarily or involuntarily, under any Federal or state law for the benefit of debtors by Manager, except for the filing of a petition in involuntary bankruptcy against Manager which is dismissed

within thirty (30) days thereafter, Facility may give notice of the immediate termination of this Agreement.

(2)     In the event Manager shall materially default in the performance of any Services set forth in this Agreement and such default shall continue for a period of sixty (60) days after written notice thereof has been given to Manager by Facility, Facility may give notice of the immediate termination of this Agreement.

(3)     At any time, without cause, upon ninety (90) days' written notice to Manager.

C.     <u>Termination by Manager</u>.  Manager may terminate this Agreement as follows:

(1)     In the event of the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors by Facility, or upon other action taken or suffered, voluntarily or involuntarily, under any Federal or state law for the benefit of debtors by Facility, except for the filing of a petition in involuntary bankruptcy against Facility which is dismissed within thirty (30) days thereafter, Manager may give notice of the immediate termination of this Agreement.

(2)     In the event that Facility shall materially default in the performance of any duty or obligation imposed upon it by this Agreement, and such default shall continue for a period of sixty (60) days after written notice thereof has been given to Facility by Manager, or Facility shall fail to remit the payments due as provided in Section 6 hereof and such failure to remit shall continue for a period of thirty (30) days after written notice thereof, Manager may give notice of the immediate termination of this Agreement.

(3)     In the event Facility takes any action to voluntarily dissolve or wind-up its affairs or liquidate a substantial portion of its assets or in the event a proceeding shall have been instituted in a court having jurisdiction seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Facility or for any substantial part of its assets, or for the winding up or liquidation of its affairs, and such proceeding shall remain undismissed or unstayed and in effect for a period of thirty (30) consecutive days or such court shall enter a decree or order granting the relief sought in such proceeding, Manager may give notice of the immediate termination of this Agreement.

(4)     At any time, without cause, upon ninety (90) days' written notice to Facility.

**10.     General Provisions**

A.     <u>Assignment</u>.  Except with respect to an assignment by Manager to any subsidiary or affiliate of Manager, neither Manager nor Facility shall have the right to assign their respective rights and obligations hereunder without the written consent of the other parties hereto.

B.    Notices.  All notices required or permitted by this Agreement shall be in writing and shall be deemed given if sent postage prepaid, certified mail, return receipt requested to the address set forth below:

| | |
|---|---|
| *To Manager:* | UHS of Delaware, Inc. |
| | c/o Universal Health Services, Inc. |
| | 367 South Gulph Road |
| | P.O. Box 61558 |
| | King of Prussia, PA 19406-0958 |
| | Attention:  General Counsel |
| | |
| *To Facility:* | Arbour-Fuller Hospital |
| | 200 May Street |
| | South Attleboro, MA 02703 |
| | Attention: CEO/CFO |
| | |
| *Copies to:* | UHS of Delaware, Inc. |
| | 367 South Gulph Road |
| | P.O. Box 61558 |
| | King of Prussia, PA 19406-0958 |
| | Attention:  General Counsel |

or such other address as either party shall notify the other in accordance with the provisions of this Section.

C.    Binding on Successors.  This Agreement shall be binding upon the parties hereto, and their successors and assigns.

D.    Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  The waiver of any of the terms and conditions of this Agreement shall not be construed as a waiver of any other terms and conditions hereof.

E.    Governing Law.  The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, notwithstanding any conflicts of law provisions to the contrary.

F.    Severability.  The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

G.    Additional Documents.  Each of the parties hereto agrees to execute any document or documents that may be reasonably requested from time to time by the other party to implement or complete such party's obligations pursuant to this Agreement.

H.    Confidentiality.  No party shall disseminate or release to any third party any information regarding any provision of this Agreement, or any financial information regarding

any other party (past, present or future) that was obtained in the course of the negotiations of this Agreement or in the course of the performance of this Agreement, without the written approval of the party to which the information pertains.

      I.     <u>Remedies Cumulative</u>. No remedy set forth in this Agreement or otherwise conferred upon or reserved to any party shall be considered exclusive of any other remedy available to any party, but the same shall be distinct, separate and cumulative and may be exercised from time to time as often as occasion may arise or as may be deemed expedient.

      J.     <u>Language Construction</u>. The language of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against any party hereto. The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

      K.     <u>No Obligation to Third Parties</u>. None of the obligations and duties of Manager or Facility under this Agreement shall in any way or in any manner be deemed to create any obligation of Manager or Facility to, or any rights in, any person or entity not a party to this Agreement.

      L.     <u>Amendments</u>. This Agreement may be amended, but only in writing, signed by the parties hereto.

      M.     <u>Entire Agreement</u>. This Agreement, including all Exhibits thereto, contains the entire agreement of the parties related to the subject matter hereof. This Agreement supersedes and replaces in its entirety any existing management services agreement between Manager and Facility.

      N.     <u>Counterparts and Facsimiles</u>. This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which shall constitute one in the same agreement. Furthermore, this Agreement may be executed by the facsimile or scanned signature of any party hereto, it being agreed that the facsimile or scanned signature of any party hereto shall be deemed an original for all purposes.

      O.     <u>Electronic Signature.</u> Signature below for Manager's Senior Vice President may be done via electronic signature. Pursuant to the *Electronic Signatures in Global and National Commerce Act (E-SIGN)*, S. 761 (106th Congress, 2000) a federal law, effective October 1, 2000, this document is deemed to have the same legal integrity as documents bearing an ink or "wet" signature. All parties to this Agreement acknowledge and represent that the affixed electronic signature carries the same legal weight and authority as the written signature, and Manager represents that the electronic signature has been executed by the individual named below.

IN WITNESS WHEREOF, the parties have executed this Agreement and caused the same to be duly delivered on their behalf as of the day and year first above written.

**MANAGER:**

**UHS OF DELAWARE, INC.**

Steve Filton, Senior Vice President

**FACILITY:**

**ARBOUR-FULLER HOSPITAL**

By: Rachel Legend

# EXHIBIT C

**U.S. Department of Labor**
Occupational Safety and Health Administration

## Notice of Alleged Safety or Health Hazards



Facility:

1) At times there is no nursing director and/or qualified nursing supervisor on the units.

2) Staff are exposed to increased risk of assault and injury from inadequate staffing levels. There have been multiple serious staff injuries, including head and neck injuries from patient assaults.

# EXHIBIT D

# United States of America

### DEPARTMENT OF LABOR

## OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

#### *SUBPOENA DUCES TECUM*



**TO: UHS of Fuller, Inc. and UHS of Delaware, Inc.**

*Pursuant to Section 8(b) of the Occupational Safety and Health Act (29 U.S.C. § 657(b))*
*you are hereby required to appear before:*

### James Mulligan, Area Director

*of the* OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION
(OSHA), UNITED STATES DEPARTMENT OF LABOR, *at* **639 Granite
Street, 4th Floor**, *in the Town of* **Braintree, MA** *on the* **8th day of October,
2019,** *at* **10:00 o'clock  AM** to produce the documents described in
Attachments A and B in relation to OSHA Inspection Number 1408076.

*You are hereby required to bring with you and produce at said time and place, or produce
by email to Abundo.Maria-Lisa@dol.gov, the following documents and other materials:*

*SEE ATTACHMENTS A and B.*

#### FAIL NOT AT YOUR PERIL

IN TESTIMONY WHEREOF *I have hereunto affixed my signature and the seal*
*of the* UNITED STATES DEPARTMENT OF LABOR *at* **Braintree, MA** this **24th** day
of September, 2019.

JAMES MULLIGAN, AREA DIRECTOR, BRAINTREE AREA OFFICE
OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION
UNITED STATES DEPARTMENT OF LABOR

1

## RETURN OF SERVICE

*I hereby certify that a duplicate original of the within subpoena was*

**Duly served**
(Indicate by check method used.)

**In person,**

**by leaving at principal office or place of business, to wit:**

_____

_____

_____

{

*on the person named herein on*

_____
(Month, day, year)

_____
(Name of person making service)

_____
(Official Title)

*I certify that the person named herein was in attendance as a witness at*

_____

**on** _____
(Month, day or days, and year)

_____
(Name of person certifying)

_____
(Official Title)

2

## ATTACHMENT A

### Definitions and Instructions

1. "You" or "your" shall mean the UHS of Fuller, Inc. dba Fuller Hospital, its subsidiaries, parents, and affiliates, or any person or entity acting or purporting to act on its behalf, including but not limited to UHS of Delaware, Inc.

2. Where not otherwise stated, each request is directed to both UHS of Fuller, Inc. and to UHS of Delaware, Inc.

3. The "Facility" shall mean Fuller Hospital, located at 200 May St, Attleboro, Massachusetts 02703.

4. UHS-DE means "UHS of Delaware, Inc."

5. The term "document" means a tangible medium that contains information of any sort, including, but not limited to, contracts, agreements, correspondence, memoranda, reports, emails, word processing documents, electronic data files, electronic or instant mail messages or other exchanges of information between computers, facsimiles, electronic or taped voice messages, spreadsheets, charts, graphs, photographs, work papers, notes, drafts, marginal notations, tape recordings, bills, invoices, account statements, checks, receipts, confirmations of electronic transactions, ledger books and associated journals, summaries or records of telephone conversations, personal conversations, negotiations or interviews, minutes or records of printed, electronic, recorded or photographic matter or sound reproductions, however produced or reproduced. A draft or non-identical copy is a separate document within the meaning of this term. Documents maintained in electronic form may be produced in electronic form.

6. The terms "concerning" and "relating to" means referring to, describing, evidencing, or constituting.

7. The term "communication" means any oral, written or other exchange or transmission of information (in the form of facts, ideas, inquiries, opinions, recommendations, analysis or otherwise), including correspondence, memos, reports, emails, electronic documents, telephone conversations, telephone or voicemail messages, face-to-face meetings or conversations, and Internet postings and discussions.

8. The use of the word "including" shall be construed to mean "without limitation." "Any" shall be construed to include the term "all," and vice versa. "Each" shall be construed to include the term "every," and vice versa.

9. Do not limit any response to any request based on perceived distinction(s) between and/or, masculine/feminine, or singular/plural.

10.     You are required to produce all responsive documents which are in your possession or custody or are under your control. You are required to search for, obtain and produce all such responsive documents, including without limitation documents that are in your custody or control but not in your immediate possession. This includes any responsive documents in the possession, custody or control of any person acting on your behalf or under your direction or control, such as your employees, accountants, agents, representatives, attorneys or advisors.

11.     Please produce the documents requested in this subpoena either 1) as they are kept in the usual course of business or 2) organized and labeled to correspond with the numbered requests.

12.     If any document responsive to this subpoena has been but is no longer in your possession, custody or control, please provide a written response stating what disposition was made of the document, the date or dates on which such disposition was made, and the reason for such disposition.

13.     If no documents exist responsive to a particular request, please state so in a written response.

14.     If you do not produce documents because you object to part of or an aspect of a request, please provide a written response stating the precise basis for the objection and produce all documents responsive to the remaining part or aspect of the request.

15.     If any documents responsive to this subpoena are withheld because of a claim of privilege, please identify the documents you claim are privileged in a written response, and please indicate for each such document: 1) the nature of the privilege or protection claimed; 2) the factual basis for claiming the privilege or protection asserted; 3) the subject matter of the document; 4) the type, length and date of the document; 5) the author of and/or signatory on the document; and 6) the identity of each person to whom the document was directed or distributed.

16.     To the extent that you claim privileges based on claims related to privacy and/or confidentiality, produce the portions of the documents that do not contain personally identifiable information.

17.     Unless otherwise stated, **the applicable time period for these requests is June 12, 2019 through the present.** Information from before June 12, 2019 which has been used or relied upon since June 12, 2019 or which describes legal duties which remain in effect after June 12, 2019, shall be considered as included within the applicable time period.

18.     Unless otherwise stated, all Requests pertain to any location, program or site at the Facility (or transportation of a patient to and from the facility).

**ATTACHMENT B**

4

Document Requests

1. All documents and data generated or received by the Facility or UHS-DE concerning specific incidents of workplace violence or patient aggression at the Facility, including but not limited to Employee Accident Reports and Sedgwick triage summary reports.

2. Workplace violence prevention programs in effect at the Facility as of , including documentation of yearly updates and changes, as well as any other written programs, policies, procedures, and/or protocols that relate to workplace violence and/or patient aggression. These include documents addressing to emergency response, communication between staff regarding potentially violent/aggressive patients, and the reporting of incidents of workplace violence and/or patient aggression.

3. Documents concerning Fuller Hospital's committees, workgroups, meetings, and/or audits relating to patient aggression and/or workplace violence.

4. Documents concerning UHS-DE's committees, workgroups, meetings, statements, policies, programs, protocols, and/or involving patient aggression and/or workplace violence.

5. All video surveillance footage of each incident of workplace violence and/or patient aggression that resulted in an employee injury.

6. All debriefing forms completed following incidents of workplace violence and/or patient aggression against staff and debriefing forms completed following restraints.

7. Risk management worksheets and Health Care Peer Review Reports concerning incidents of workplace violence and/or patient aggression against staff, including but not limited to MIDAS data and reports.

8. Root cause analyses of incidents of workplace violence or patient aggression against staff.

9. All documents concerning any workers' compensation claim or potential workers' compensation by any of your employees arising out or involving an incident of workplace violence or patient aggression at the Facility, including but not limited to First Report of Injury (FROI) Forms.

10. For each patient who assaulted a staff member, the New Patient High-Risk Communication form completed upon admission and the Risk of Aggression rating completed by a physician.

11. For each patient who assaulted a staff member, the portion of the nursing assessment and medical assessment, completed upon admission, describing the patient's potential for aggression and violence.

5

12. All Nursing Supervisor Reports and Summaries, including all pages and components of such documents.

13. For each patient who assaulted staff, all documents on which that patient's behavior, including aggression, is documented over a 24-hour period at 15-minute intervals.

14. Loss control analyses and letters describing employee injuries and patient aggression/workplace violence at Fuller Hospital, as well as Corrective Action Plans created by Respondent in response to letters or reports from the UHS of Delaware Loss Control Manager.

15. Documents sufficient to show (or a list showing) corrective actions taken in response to any incident of workplace violence or patient aggression.

16. For the 24-hour periods both before and after the occurrence of the incidents referenced in Request Number 1, any and all documents concerning staffing arrangements on each unit, including but not limited to unit assignments sheets, daily staffing reports, and staffing schedules reflecting changes by nursing supervisors or schedulers at the start of a shift.

17. The patient census document listing census figures along with admissions and discharges for each day from January 1, 2019 to Present.

18. Written programs, policies, procedures, and/or protocols relating to staffing at the Facility.

19. Documents concerning UHS-DE's committees, workgroups, meetings, statements, policies, programs, and/or protocols for staffing levels at behavioral health hospitals, including but not limited to employee per occupied bed ("EPOB") targets and reports.

20. From January, 2017 to present, documents concerning employee suggestions and/or complaints about exposure to workplace violence and/or patient aggression, including complaints submitted through the UHS Compliance Hotline or in Patient Safety Culture Surveys and other surveys of employees at the Facility, along with any of your responses to employee suggestions and/or complaints.

21. Documents containing summaries of monthly visits and analyses from Universal Health Services, UHS of Delaware, and/or loss control representatives concerning workplace violence and/or patient aggression.

22. Documents sufficient to show (or a list showing) names, job titles, phone numbers, and email addresses of all employees and former employees who worked at the facility between January 1, 2017 and the present.

23. For January 2017 to present, documents sufficient to show (or a list showing) the names

and job titles of the managers at the facility who are employed by UHS of Delaware, Inc. or another corporate parent.

24. Documents sufficient to show physical restraint programs, policies, protocols, and procedures implemented at the Facility since January 1, 2017.

25. Employee handbook(s) and/or onboarding documents distributed to employees at the Facility at any point from January 1, 2017 to present.

26. Patient handbook(s) and/or other documents distributed to patients and their families at the facility from January 1, 2017 to present.

27. Agreements and contracts between UHS-DE and Fuller Hospital, including but not limited to the Management Agreement(s) and any addendums thereto.

28. Documents, including policies and analyses, concerning the use and distribution of communication devices such as two-way radios (or "walkie talkie") and/or concerning panic buttons.

29. The Medical Staff Bylaws and/or Medical Executive Committee Bylaws for Fuller Hospital.

30. Any and all documents concerning the governance and operation of the Board of Governors, Board of Advisors, and/or Governing Body, including but not limited to: bylaws; policies; memoranda; strategic plans; and meeting minutes, notes, and agendas.

31. Any and all documents concerning the governance and operation of the Daily Flash Meeting, Performance Improvement Committee, Risk Council, Patient Safety Committee, and Restraint Reduction Committee, including but not limited to: bylaws; policies; memoranda; corrective action plans; performance improvement plans; and meeting minutes, notes, reports, and agendas.

32. Documents sufficient to show the job description and major responsibilities of the following individuals: (a) Fuller Hospital CEO; (b) Fuller Hospital Chief Financial Officer; (c) Fuller Hospital Chief Medical Officer; (d) Fuller Hospital Medical Director; (e) Fuller Hospital Clinical Director; (f) Fuller Hospital Human Rights Officer; (g) Fuller Hospital Chief Nursing Officer; (h) Fuller Hospital Director of Performance Improvement/Risk Management; (i) Fuller Hospital Director of Human Resources; (j) UHS-DE Regional Finance Director; (k) UHS-DE Vice President Gary Gilberti; (l) UHS-DE Loss Control Manager Gina Gilmore; (m) UHS-DE Loss Control Director Valerie Cupo; (m) UHS-DE Director of Insurance; and (n) UHS-DE Senior Vice President Karen Johnson.

33. Any and all documents, including but not limited to instruction manuals and handbooks, concerning UHS-DE training programs for chief operating officers, chief financial officers and chief executive officers.

34. Any and all documents, including but not limited to PowerPoint presentations and training materials, concerning UHS-DE orientation events for risk managers, directors of nursing, human resource directors, chief medical officers, and loss control managers.

35. Any and all documents concerning meetings of the CEOs of inpatient facilities in Massachusetts that were owned and/or managed by UHS of Delaware, Inc., including but not limited to meetings convened by Gary Gilberti.

36. Any and all documents concerning the UHS-DE Ten Elements of Risk Management (T.E.R.M.) program.

37. Any and all documents concerning awards granted by UHS or UHS-DE, including but not limited to the Service Excellence Award and the Chairman's Council Award.

38. Any and all documents concerning UHS-DE Risk Management and Clinical Services patient safety advisories, including but not limited to Senior Leadership Oversight of Patient Checks.

39. Documents sufficient to show, or a summary showing total hours worked hospital wide for CY2019 to date, and hours worked by nurses and MH for the same time period.